**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

KAREN TREJO H.,[1]          ) Case No. CV 19-7378-JPR
                            )
              Plaintiff,    )
                            ) **MEMORANDUM DECISION AND ORDER**
        v.                  ) **AFFIRMING COMMISSIONER**
                            )
ANDREW M. SAUL,             )
Commissioner of Social      )
Security,                   )
                            )
              Defendant.    )
_____    )

**I.    PROCEEDINGS**

Plaintiff seeks review of the Commissioner's final decision denying her application for Social Security supplemental security income benefits ("SSI"). The parties consented to the jurisdiction of the undersigned U.S. Magistrate Judge under 28 U.S.C. § 636(c). The matter is before the Court on the parties' Joint Stipulation, filed July 20, 2020, which the Court has taken under submission without oral argument. For the reasons stated

_____

[1] Plaintiff's name is partially redacted in line with Federal Rule of Civil Procedure 5.2(c)(2)(B) and the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States.

below, the Commissioner's decision is affirmed.

**II. BACKGROUND**

Plaintiff was born in 1981 and moved to the United States from Honduras around 1990. (See Administrative Record ("AR") 118, 251.)  She graduated high school in 2000 and worked part time as a nurse's assistant or caregiver from March 2009 until September 2011.  (AR 135-36.)

On November 18, 2011, Plaintiff applied for SSI, alleging that she had been unable to work full time since July 1, 2004, because of chronic cocci meningitis.[2]  (AR 118, 135; see AR 29.) After her applications were denied initially and on reconsideration (AR 75, 80; see also AR 54, 65), she requested a hearing before an Administrative Law Judge (AR 85).  One was held on August 29, 2013, at which Plaintiff appeared without representation and testified through a Spanish-language interpreter.  (AR 38-40, 42-43, 115-17.)  The ALJ issued an unfavorable decision on November 5, 2013, finding that she was not disabled as of her filing date, November 18, 2011.[3]  (AR 20, 27.)  After retaining counsel, Plaintiff requested review from the Appeals Council (AR 15-16), which denied it on April 23, 2015 (AR 1).

Plaintiff appealed (AR 576-78, 596-600), and on September

---

[2]  Cocci meningitis is a form of "disseminated" coccidioidomycosis, colloquially referred to as "Valley Fever," in which a fungal infection spreads throughout the body.  See Edison v. United States, 822 F.3d 510, 513-14 (9th Cir. 2016).

[3]  Because SSI payments may not be awarded retroactively, Plaintiff's effective onset date is her filing date.  See SSR 83-20, 1983 WL 31249, at *1 (1983).

27, 2016, this Court reversed and remanded for further administrative proceedings (AR 579-95).  On June 28 and September 20, 2018, and January 23 and May 22, 2019, the ALJ conducted additional hearings, at which Plaintiff, who was represented by counsel, her mother, her aunt, and a VE testified. (See AR 457-550.)  In a written decision dated June 13, 2019, the ALJ again found Plaintiff not disabled.  (AR 429-49.)  This action followed.

**III.  STANDARD OF REVIEW**

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits.  The ALJ's findings and decision should be upheld if they are free of legal error and supported by substantial evidence based on the record as a whole.  See Richardson v. Perales, 402 U.S. 389, 401 (1971); Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007).  Substantial evidence means such evidence as a reasonable person might accept as adequate to support a conclusion.  Richardson, 402 U.S. at 401; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007).  It is "more than a mere scintilla, but less than a preponderance." Lingenfelter, 504 F.3d at 1035 (citing Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006)).  "[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high."  Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019).  To determine whether substantial evidence supports a finding, the court "must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion."  Reddick v. Chater, 157 F.3d 715, 720 (9th Cir.

3

1998). "If the evidence can reasonably support either affirming or reversing," the reviewing court "may not substitute its judgment" for the Commissioner's. Id. at 720-21.

**IV.  THE EVALUATION OF DISABILITY**

People are "disabled" for Social Security purposes if they can't engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or has lasted, or is expected to last, for a continuous period of at least 12 months. 42 U.S.C. § 423(d)(1)(A); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992).

A.  The Five-Step Evaluation Process

An ALJ follows a five-step sequential evaluation process to assess whether someone is disabled. 20 C.F.R. § 416.920(a)(4); Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995) (as amended Apr. 9, 1996). In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim must be denied. § 416.920(a)(4)(i). If not, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting her ability to do basic work activities; if not, a finding of not disabled is made and the claim must be denied. § 416.920(a)(4)(ii).

If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R., part 404, subpart P, appendix

4

1; if so, disability is conclusively presumed and benefits are awarded. § 416.920(a)(4)(iii). If not, the fourth step requires the Commissioner to determine whether the claimant has sufficient residual functional capacity ("RFC")[4] to perform her past work; if so, she is not disabled and the claim must be denied. § 416.920(a)(4)(iv). The claimant has the burden of proving she is unable to perform past relevant work. Drouin, 966 F.2d at 1257. If the claimant meets that burden, a prima facie case of disability is established. Id.

If that happens or if the claimant has no past relevant work, the Commissioner bears the burden of establishing that the claimant is not disabled because she can perform other substantial gainful work available in the national economy, the fifth and final step of the sequential analysis. § 416.920(a)(4)(v).

B.   The ALJ's Application of the Five-Step Process

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since November 18, 2011, the application date. (AR 438.) At step two, he determined that she had severe impairments of "chronic cocci meningitis, status post ventricular peritoneal shunt," and hydrocephalus.[5] (Id.) He

_____

[4] RFC is what a claimant can do despite existing exertional and nonexertional limitations. § 416.945; see Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989). The Commissioner assesses the claimant's RFC between steps three and four. Laborin v. Berryhill, 867 F.3d 1151, 1153 (9th Cir. 2017) (citing § 416.920(a)(4)).

[5] Hydrocephalus results from an excessive accumulation of cerebrospinal fluid in the brain, causing abnormal widening of
(continued...)

5

concluded that her low-back condition and left-leg pain were not severe because there was "little objective medical evidence for these conditions, and the record show[ed] that the pain she reported was intermittent, addressed primarily with over-the-counter medication, and did not continue in any significant way after November 2015." (AR 441.) At step three, he found that her impairments did not meet or equal a Listing. (Id.) At step four, he determined that she had the RFC to perform light work with some limitations: she was "able to lift or carry up to 20 pounds occasionally [and] 10 pounds frequently"; could "stand or walk for up to 6 hours of an 8-hour workday"; could "sit for up to 8 hours cumulatively in an 8-hour workday"; could "occasionally climb, bend, kneel, and stoop"; "must avoid crawling"; could "less than occasionally push or pull and reach above shoulder level on the bilateral upper extremities"; "should not work at dangerous heights, climb ladders, or operate dangerous, moving machinery"; and "must avoid driving a motor vehicle or ambulating over uneven terrain." (AR 441-42.) The ALJ found her unable to perform any past relevant work (AR 447), but she could work in other positions existing in significant numbers in the national economy (AR 447-48). Accordingly, he found her not disabled. (AR 448-49.)

⁵ (...continued)
spaces in brain ventricles and potentially harmful pressure on brain tissues. Hydrocephalus Fact Sheet, Nat'l Inst. Neuro. Disorders & Stroke, http://www.ninds.nih.gov/disorders/ hydrocephalus/detail_hydrocephalus.htm (last visited June 22, 2021).

**V.    DISCUSSION**

Plaintiff alleges that the ALJ erred in assessing her symptom testimony and the statements and testimony of her aunt and mother and therefore erroneously concluded that she was not disabled.  (See J. Stip. at 4-7, 9-12, 17-18.)  For the reasons discussed below, the ALJ properly discounted her symptom statements, and any error in assessing the lay-witness testimony was harmless.

   A.    The ALJ Properly Discounted Plaintiff's Symptom
         Statements

Plaintiff asserts that the ALJ failed to properly evaluate her subjective symptom statements.  (J. Stip. at 9-12.)  For the reasons discussed below, the ALJ did not err.

   1.    Applicable law

An ALJ's assessment of a claimant's allegations concerning the severity of her symptoms is entitled to "great weight." Weetman v. Sullivan, 877 F.2d 20, 22 (9th Cir. 1989) (as amended); Nyman v. Heckler, 779 F.2d 528, 531 (9th Cir. 1985) (as amended Feb. 24, 1986).  "[T]he ALJ is not 'required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A).'"  Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012) (quoting Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989)).

In evaluating a claimant's subjective symptom testimony, the ALJ engages in a two-step analysis.  See Lingenfelter, 504 F.3d at 1035-36; see also SSR 16-3p, 2016 WL 1119029, at *3 (Mar. 16, 2016).  "First, the ALJ must determine whether the claimant has

7

presented objective medical evidence of an underlying impairment '[that] could reasonably be expected to produce the pain or other symptoms alleged.'" Lingenfelter, 504 F.3d at 1036 (quoting Bunnell v. Sullivan, 947 F.2d 341, 344 (9th Cir. 1991)). If such objective medical evidence exists, the ALJ may not reject a claimant's testimony about the severity of her symptoms merely because it lacks evidential support. See id.

If the claimant meets the first test, the ALJ may discount her subjective symptom testimony only if he makes specific findings that support the conclusion. See Berry v. Astrue, 622 F.3d 1228, 1234 (9th Cir. 2010). Absent a finding or affirmative evidence of malingering, the ALJ must provide a "clear and convincing" reason for rejecting the claimant's testimony. Brown-Hunter v. Colvin, 806 F.3d 487, 493 (9th Cir. 2015) (as amended) (citing Lingenfelter, 504 F.3d at 1036); Treichler v. Comm'r of Soc. Sec. Admin., 775 F.3d 1090, 1102 (9th Cir. 2014). The ALJ may consider, among other factors, the claimant's (1) reputation for truthfulness, prior inconsistent statements, and other testimony that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; (3) daily activities; (4) work record; and (5) physicians' and third parties' statements. See Rounds v. Comm'r Soc. Sec. Admin., 807 F.3d 996, 1006 (9th Cir. 2015) (as amended); Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002). If the ALJ's evaluation of a plaintiff's alleged symptoms is supported by substantial evidence in the record, the reviewing court "may not engage in second-guessing." Thomas, 278 F.3d at 959.

## 2. Relevant background

### a. *Plaintiff's Medical History*

In 2004, Plaintiff was diagnosed with recurrent cocci meningitis and "communicating" hydrocephalus.[6]  (AR 237, 400-02.) She was prescribed voriconazole[7] on a long-term basis.  (AR 237.) She was hospitalized overnight in 2009 with a flare-up.  (AR 391-93.)  An October 2011 brain scan showed "hydrocephalus with enlarged lateral and third ventricles," with "hypodensity surrounding the frontal horns of the lateral ventricles, suggestive of transependymal fluid flow."[8]  (AR 237-38.)  In October 2011, she stopped taking her medication because she wanted to become pregnant, but she soon required hospitalization after developing worsening headaches, nausea, and vomiting.  (AR 237, 242.)  A shunt was placed in her brain.  (AR 237.) Following this surgery, she reported that she was "doing well," with some dizziness but none of the headaches, nausea, or blurred

---

[6] "Communicating" means that cerebrospinal fluid can still flow between the ventricles, which remain open.  See Hydrocephalus, Health, https://www.hopkinsmedicine.org/health/ conditions-and-diseases/hydrocephalus (last visited June 22, 2021).

[7] Voriconazole is used to treat a variety of fungal infections.  See Voriconazole, WebMD, https://www.webmd.com/ drugs/2/drug-63366-5326/voriconazole-oral/voriconazole-oral/ details (last visited June 22, 2021).

[8] Transependymal fluid flow occurs when increased pressure within the cerebral ventricles causes the ependymal lining to be disrupted and allows the migration of cerebrospinal fluid into the brain parenchyma around the cerebral ventricles. Transependymal Edema, Radiopaedia, https://radiopaedia.org/ articles/transependymal-oedema (last visited June 29, 2021).  It usually occurs during acute obstructive hydrocephalus.  Id.

vision she had experienced before the surgery.  (AR 2364.)

In March and April 2013, she was "stable," and in August 2013, her condition was "well controlled on voriconazole without symptoms."  (Suppl. AR 1225-26, 1229, 1231.)[9]  In August 2014, she reported having headaches three or four times a month but said that had "improved from before" the shunt was placed. (Suppl. AR 1218.)

In August 2014, she became pregnant against medical advice. (Suppl. AR 1214, 1285.)  She had a catheter placed in September and began taking a different, intravenous medication.  (Suppl. AR 1209-13, 1283.)  Her pregnancy was ectopic and was discontinued (Suppl. AR 1274-75, 1278), and she resumed taking voriconazole (Suppl. AR 1144).

In August 2015, she had a headache, which she treated with ibuprofen with "good relief."  (Suppl. AR 1090.)  She refused her doctor's recommendation to go to the emergency department for further evaluation.  (Suppl. AR 1091.)

A September 2015 CT scan of her brain showed "slit-like" lateral and third ventricles, but the fourth ventricle appeared "slightly larger" than in the previous CT scan, which "rais[ed a] suspicion for focal entrapment."[10]  (Suppl. AR 1257.)  But there

---

[9] Exhibit 9F was not included in the Certified Administrative Record filed with the Court on February 26, 2020. On January 14, 2021, prompted by the Court, Defendant filed Exhibit 9F and paginated it 1086 through 1291.  Because the original AR includes different documents with those page numbers (see AR 1086-291), the Court uses "Suppl. AR" in referring to the pages of Exhibit 9F.

[10] Focal entrapment of a ventricle is an obstruction to the
(continued...)

was no hydrocephalus, "extra-axial fluid collections," or edema along the shunt catheter. (Id.) That same month, she complained of right-sided "intermittent, throbbing . . . headache[s]" and reported having "some dizziness." (Suppl. AR 1086.) On November 6, she reported having a headache that had started the previous week, but ibuprofen provided "good relief." (AR 1251.) Kernig[11] and Brudzinski[12] tests were negative, and she deferred going to the emergency department because the headache was not severe and she was otherwise asymptomatic. (Id.)

In January 2016, she reported that her headaches had returned. (AR 1465.) But they were "much less severe" than when she had meningitis, and she had no dizziness, nausea, or phonophobia.[13] (Id.) Ibuprofen provided relief. (Id.) A

---

[10] (...continued)
entry and exit path of cerebrospinal fluid through the ventricle. Trapped Ventricle, Radiopaedia, https://radiopaedia.org/articles/trapped-ventricle (last visited June 29, 2021).

[11] A Kernig sign indicates the presence of meningitis. Medical Definition of Kernig Sign, MedicineNet, https://www.medicinenet.com/kernig_sign/definition.htm (last visited June 22, 2021). The test is done by having the person lie flat on the back, flex the thigh so that it is at a right angle to the trunk, and completely extend the leg at the knee joint. Id. If the leg cannot be completely extended because of pain, that may indicate meningitis. Id.

[12] A Brudzinski test is used to diagnose meningitis. Brudzinski's Sign, Physiopedia, https://www.physio-pedia.com/Brudzinski%E2%80%99s_Sign (last visited June 22, 2021). Severe neck stiffness causes a patient's hips and knees to flex when the neck is flexed, which is a symptom of meningitis. Id.

[13] Phonophobia is an intolerance of or hypersensitivity to sound. Phonophobia, Merriam-Webster, https://www.merriam-webster.com/dictionary/phonophobia (last visited June 30, 2021).

February 2016 brain scan revealed that her "shunt catheter tip placement" was "stable." (AR 1362.) Her lateral and third ventricles were "slightly enlarged when compared to" a September 2015 scan "but remain[ed] small to normal in size." (Id.) The fourth ventricle was "enlarged and slightly larger when compared to [the] prior CT" scan. (Id.) In August 2016, she reported that she had headaches two or three times a week, but they "completely improve[d] with ibuprofen." (AR 1190.) She stated that she was under a lot of stress because of a "recent divorsc [sic] and living with parents, trying to find a job." (Id.) On December 5, 2016, she reported that her headaches were "improved," and she was taking ibuprofen as needed up to three times a week. (AR 1069.) On December 8, she discontinued voriconazole because of a skin reaction and began taking posaconazole.[14] (AR 1026.)

On January 9, 2017, Plaintiff had a head CT scan, which showed "[n]o significant change from the prior examination," with the "shunt . . . in stable position with unchanged size of the ventricular system." (AR 1991.) She reported "intermittent headaches" on January 17, 2017, but said they were relieved by over-the-counter medication; she denied any other complaints. (AR 2068.) During an examination, she could "[m]ove all extremities without difficulty" and had "5/5 strength

_____

[14] Posaconazole is an antifungal used to prevent fungal infections in patients who have weakened immune systems. See Posaconazole 100 Mg Tablet, Delayed Release Azole Antifungals-Systemic, WebMD, https://www.webmd.com/drugs/2/drug-145142-1598/posaconazole-oral/posaconazole-delayed-release-oral/details (last visited June 22, 2021).

throughout," a "[s]teady gait upon ambulation," and no pain.
(Id.) In March 2017, she reported that she was taking
posaconazole without any issues and denied having any headaches,
nausea, or vomiting. (AR 1990.) In September 2017, she again
reported that she was "doing well," with "no issues," and denied
having headaches, nausea, or vomiting. (AR 1942.)

In November 2017, she complained of a "few episodes of
confusion" within the previous two weeks, "including not knowing
where she was" and being "slower in answers." (AR 1858.) She
denied having any headaches, fever, chills, neck pain, or
stiffness. (Id.) She was referred to a neurologist. (AR 1859.)
On November 30, 2017, she reported that her "episodes of
confusion ha[d] completely resolved." (AR 1775.) On that date,
"[s]he was fully oriented to person, place, and time, and knew
who the president was." (Id.) "Her conversation was fluid,"
"without hesitation or delay," and she "denie[d] any headaches,
fever/chills/sweats." (Id.) During a neurological examination
on December 7, 2017, she presented with "no complaints" and
"continue[d] to have resolution of her confusion issues." (AR
1693.) Her examination was "unremarkable," and the neurologist
noted that the "most likely causes" of the confusion episodes
were "sleep deprivation and/or stress in her life." (AR 1694.)
Plaintiff had a head CT scan on December 12, 2017, in which
"[t]he lateral and 3rd ventricles appear[ed] well-decompressed,
without significant interval change in size, although minimally
larger than the prior examination." (AR 1652.) "The 4th
ventricle [was] enlarged, but grossly unchanged from the prior
examination." (Id.) There was "no gross acute infarct, mass,

13

bleed, midline shift, or abnormal extra-axial fluid collections."
(Id.)

On February 1, 2018, she reported that she had been
"persistently without symptoms since November" and denied any
dizziness, confusion, difficulty walking, or headache.  (AR
1565.)  She again denied any symptoms on February 13, 2018, and
was "neuro[logically] intact."  (AR 2066.)

On March 2, 2018, she went to an emergency department with
confusion and headache.  (AR 2251.)  She refused a head scan
because she was pregnant and underwent an MRI, which revealed no
issues with her shunt.  (Id.)  A March 5, 2018 head scan showed
that her "ventricular shunt [was] in place," with "mild to
moderate hydrocephalus, unchanged in degree from [the] prior
MRI."  (AR 2082.)  There was no hemorrhage, extra-axial fluid
collections, or masses.  (Id.)  Despite the lack of changes,
Plaintiff underwent a right frontal shunt revision that day.
(AR 2265.)  The next day she complained of dizziness and
"difficulty fixating" (AR 2270), demonstrated a "slow, cautious
gait," "required occasional assistance to manage [a] front
wheeled walker," and her walking "[d]istance [was] limited by
fatigue" (AR 2274).  While she was in the hospital it was
discovered that her pregnancy had ended as a result of a
spontaneous abortion.  (AR 2278.)  A March 8 head CT scan
confirmed that the ventricular shunt had been revised and showed
that the lateral ventricles and the third ventricle were
"significantly decreased in size," but the fourth ventricle
"remain[ed] unchanged in size."  (AR 2076.)  On March 20, 2018,
Plaintiff reported that she was "doing well," with "no headaches,

14

nausea, vomiting, dizziness or confusion." (AR 2297.)

In October 2018, Plaintiff again became pregnant. (AR 4243.) She stopped taking posaconazole (AR 4044) and started undergoing intravenous infusion of Ambisome[15] through her first trimester of pregnancy. (AR 4636.) In January 2019, she was "doing well," had "occasional nausea," which she thought was "due to pregnancy," and had "[n]o other neuro[logical symptoms]." (AR 7119.)

> b. *The ALJ's Decision*

The ALJ noted that Plaintiff

> testified she has many headaches, dizziness, loss of balance, and back pain. She testified she becomes dizzy when she bends over, and she moves around slowly. She testified she does not take public transportation alone, and her aunt goes with her when she goes out to walk. She testified her aunt helps her with bathing, caring for her hair, and cooking. She testified she must rest during the day because she feels weak and fatigued. She testified she has headaches every day, for which she takes Tylenol. She testified . . . she was forgetting things prior to her surgery in March 2018, and her memory has not improved since then.

(AR 442.) The ALJ reviewed these claimed limitations and found that her "medically determinable impairment[s] could reasonably

---

[15] Ambisome is used to treat a variety of serious fungal infections in patients who cannot tolerate other treatments and is usually given by injection. Ambisome Vial, WebMD, https://www.webmd.com/drugs/2/drug-6421/ambisome-intravenous/details (last visited June 22, 2021).

be expected to cause the alleged symptoms; however, [her] statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record." (AR 443.) He discounted her subjective symptom statements because they were

> inconsistent with the medical record. The medical record
> shows relatively few complaints of headaches, dizziness,
> or other symptomology.

(Id.)

He also noted that her symptom statements were inconsistent with her conservative treatment, stating that

> except for when she stopped taking her medication in
> October 2011, she uniformly reported that ibuprofen
> resolved the headaches, and the record contain[ed] little
> or no evidence of [her] requiring stronger medication for
> her headaches.

(Id.)

Next, he found her symptom statements inconsistent with her admitted daily activities, noting that

> [i]n August 2014, she reported she had gone to Guatemala
> a couple of months before. In September 2015, she was
> planning to travel to Brazil . . . .

> At her first occupational therapy visit after the
> March 2018 revision of her shunt [she] indicated she
> previously had no limitation, was driving, and enjoyed
> dancing . . . .

> At the consultative psychological evaluation,
> [Plaintiff] reported watching television, listening to

16

music, caring for pets, exercising, . . . performing
household chores[,] . . . socializing with friends on
weekends[, and] . . . work[ing] as a babysitter from
approximately 2005 to 2006 until 2012.

(AR 444-45 (some citations omitted).)

Finally, he noted that despite her alleged debilitating symptoms, "in much of the medical record," her "primary concern appear[ed] to be with contraception or conceiving a child." (AR 445.)

### 3. <u>Analysis</u>

Plaintiff challenges the ALJ's discounting of her subjective symptom statements. (<u>See</u> J. Stip. at 9-12.) For the reasons discussed below, the ALJ did not err.

a. *Plaintiff's Symptom Statements and Testimony*

i. *Medical and other evidence*

The ALJ properly concluded that Plaintiff's subjective symptom statements were inconsistent with the medical record's "relatively few complaints of headaches, dizziness, or other symptomology." (AR 443); <u>Morgan v. Comm'r of Soc. Sec. Admin.</u>, 169 F.3d 595, 600 (9th Cir. 1999) (finding "conflict" with "objective medical evidence in the record" to be "specific and substantial reason[]" undermining plaintiff's allegations); § 416.929(c)(2). Among other things, the ALJ noted that neither of two consultative internal-medicine evaluations supported the "low level of functionality" Plaintiff claimed. (AR 443.) A February 2012 evaluation noted that she reported having "occasional headaches" and "sometimes get[ting] dizzy." (AR 289.) She denied any fatigue, seizures, or other medical

17

problems.  (Id.)  Her memory "appeared to be average," and she "appeared to be in no acute distress."  (AR 290.)  She "ambulate[d] with a normal gait," exhibited "no evidence of incoordination," and was able to perform a tandem walk.  (AR 291-92.)  Her cerebellar testing was "intact without dysmetria[16] on finger-to-nose," and heel-to-shin testing was intact.  (AR 292.)

At an April 2018 consultative evaluation, she walked with a normal gait and balance, exhibited normal muscle bulk and tone without atrophy, and had 5/5 strength throughout without focal motor deficits except for some weakness in her grip.  (AR 443; see AR 2427-29.)  She reported having chronic daily headaches (AR 2426), but three weeks later she denied any headaches to her own medical provider and reported "feeling well with no specific concerns or questions."  (AR 2519.)

And as the ALJ noted, treatment records indicate that her symptoms were not as severe or frequent as she described.  For instance, her reported dizziness and confusion reported in mid-November 2017 had completely resolved on its own by November 30.  (AR 1775.)  During a December neurological examination she reported that the confusion had not returned.  (AR 1693.)  The medical records showed that her headaches, too, were less frequent and debilitating than she described.  She reported on numerous dates that she had no headaches or other symptoms, that any headaches were only occasional, and that they were well

---

[16] Dysmetria is the inability to control the distance, speed, and range of motion necessary to perform smoothly coordinated movements.  Dysmetria: What Is It, Causes, Diagnosis, Treatment, and More, Osmosis, https://www.osmosis.org/answers/ dysmetria (last visited June 29, 2021).

controlled with ibuprofen. (See AR 1251 (Nov. 2015), 1465 (Jan. 2016), 1190 (Aug. 2016), 1069 (Dec. 2016), 2068 (Jan. 2017), 1942 (Sept. 2017), 1775 (Nov. 2017), 1858 (Nov. 2017), 1693-94 (Dec. 2017), 1565 (Feb. 2018), 2066 (Feb. 2018), 2297 (Mar. 2018).)

At most, the few records cited by Plaintiff establish that the medical evidence was susceptible of more than one rational interpretation, which is insufficient to warrant reversal. See Molina, 674 F.3d at 1111 (holding that in such circumstances "we must uphold the ALJ's findings if they are supported by inferences reasonably drawn from the record"); Tommasetti v. Astrue, 533 F.3d 1035, 1041 (9th Cir. 2008) (ALJ is "final arbiter with respect to resolving ambiguities in the medical evidence"). The ALJ properly considered the objective record in discounting Plaintiff's symptom statements.

### ii. *Conservative treatment*

The ALJ properly discounted Plaintiff's allegations because the record showed that her symptoms were generally controlled with conservative treatment. As an initial matter, Plaintiff has not discussed or contested the ALJ's reliance on this reason to discount her symptom statements. By failing to do so, she implicitly concedes its legitimacy. See Arlene R.M. v. Comm'r of Soc. Sec., No. 17-CV-370-FVS, 2019 WL 267912, at *5 (E.D. Wash. Jan. 18, 2019) (rejecting plaintiff's argument that her "credibility" was "bolstered" by certain evidence when she "fail[ed] to address the reasons cited by the ALJ or demonstrate any error"). For that reason alone, remand is not warranted on this claim. In any event, this reason and the others the ALJ gave were clear and convincing and fully supported by the record.

Parra, 481 F.3d at 750-51 (finding "conservative treatment," such as "treat[ment] with an over-the-counter pain medication," sufficient to discount claimant's testimony as to severity of impairment).  Although Plaintiff took various medications for her chronic cocci meningitis and periodically underwent scans to evaluate her headaches, she repeatedly reported that the latter resolved with ibuprofen, and she did not need stronger medication, as the ALJ noted (AR 443), or more aggressive treatment.

For instance, on November 6, 2015, she reported that she had had a headache the prior week one day when waking up and that she "[t]ried ibuprofen with good relief." (AR 1251.) Although the attending physician recommended that she go to the emergency room "for further evaluation," she refused, stating that she "would like to defer ER admission since she [was] otherwise asymptomatic." (Id.) A January 27, 2016 neurosurgery-consultation note indicates that she believed her headaches were related to stress caused by her separation from her husband and that when she "[took] ibuprofen 600 mg . . . [they went] away." (AR 1465.) And on August 22, 2016, she reported that her headaches still occurred "2-3x/week [but were] completely improve[d] with ibuprofen." (AR 1190.) She reiterated the effectiveness of her ibuprofen treatment and that she had no symptoms on numerous other dates. (See AR 2068 (Jan. 2017), 1942 (Sept. 2017), 1775 (Nov. 2017), 1858 (Nov. 2017), 1693 (Dec. 2017), 1565 (Feb. 2018), 2066 (Feb. 2018), 2297 (Mar. 2018).)

True, she underwent surgeries in October 2011 (AR 237), before her effective onset/application date, and March 2018 (AR

20

2265), even though her head scan was unchanged (AR 2082), to place a shunt in her brain and to revise it, respectively.  But her conservative medication treatment consistently provided effective symptom relief between those surgeries and afterward. See Patricia W. v. Saul, No. SA CV 19-1537-PLA, 2020 WL 2523242, at *12 (C.D. Cal. May 18, 2020) (holding that ALJ properly discounted plaintiff's testimony based on her generally conservative treatment even though she underwent hip surgery, given that she was able to work until four months before surgery and walked with normal gait and had less hip pain after it). Therefore, the ALJ properly discounted Plaintiff's symptom statements and testimony as inconsistent with her conservative treatment.

### iii. *Daily activities*

The ALJ properly discounted Plaintiff's allegations as inconsistent with her daily activities. (AR 444.)  An ALJ may discredit a claimant's subjective symptom testimony "when [she] reports participation in everyday activities indicating capacities that are transferable to a work setting."  Molina, 674 F.3d at 1113.  "Even where those activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment," id., or "suggest" that her "claims about the severity of [her] limitations were exaggerated," Valentine v. Comm'r Soc. Sec. Admin., 574 F.3d 685, 693 (9th Cir. 2009).

The ALJ noted that Plaintiff reported at various times that she had traveled out of the country, was driving, enjoyed

21

dancing, cared for pets, exercised, performed household chores, socialized with friends on the weekends, and worked as a babysitter. (AR 444-45.) The ALJ properly concluded that these activities suggested some ability to work and were inconsistent with her claims of complete disability. See Burch v. Barnhart, 400 F.3d 676, 680 (9th Cir. 2005) (ALJ properly discounted plaintiff's statements when her activities "suggest[ed] that she is quite functional" because she was "able to care for her own personal needs, cook, clean and shop," "interact[] with her nephew and her boyfriend," and "manage her own finances"); Fleming v. Astrue, 274 F. App'x 571, 572 (9th Cir. 2008) (ALJ properly discounted plaintiff's claims concerning effects of her chronic fatigue syndrome given her daily activities, which included gardening and bicycling).

### iv. *Planned pregnancy*

Finally, the ALJ discounted Plaintiff's symptom statements as inconsistent with her plans and attempts to conceive a child. As the ALJ noted, despite her alleged debilitating symptoms, "in much of the medical record," her "primary concern appear[ed] to be with contraception or conceiving a child." (AR 445.) She attempted to get pregnant despite the risks a pregnancy posed for someone with her condition. In fact, she discontinued the medication that controlled her cocci meningitis in order to accommodate a pregnancy. (AR 4636.)

Even assuming the ALJ erred, however, any error was harmless because as discussed he provided three clear and convincing reasons for partially discounting Plaintiff's testimony — inconsistency with the medical record, conservative treatment,

and daily activities.  See Larkins v. Colvin, 674 F. App'x 632,
633 (9th Cir. 2017) ("[B]ecause the ALJ gave specific, clear and
convincing reasons for finding [plaintiff] not fully credible,
any error in the additional reasons the ALJ provided . . . was
harmless.").

　　　　　　　　b.  *RFC and VE Hypotheticals*

　　　　The ALJ properly discounted Plaintiff's testimony, so he was
not required to posit hypotheticals to the VE based on her
subjective symptoms or include them in the RFC.  (See J. Stip. at
5-7 (claiming that ALJ erroneously discounted her subjective
symptoms and therefore erred in hypotheticals he presented to
VE)); Bayliss v. Barnhart, 427 F.3d 1211, 1217 (9th Cir. 2005)
(failure to include limitations in RFC was not erroneous when ALJ
properly discounted plaintiff's testimony regarding severity of
her symptoms related to them); Batson v. Comm'r of Soc. Sec.
Admin., 359 F.3d 1190, 1197 (9th Cir. 2004) (RFC assessment that
was contrary to VE's opinion was not erroneous when ALJ properly
discounted testimony on which VE opinion was based).  As
discussed, substantial evidence supported the ALJ's discounting
of Plaintiff's subjective symptom statements.

　　　　B.  Any Error In Discounting the Lay-Witness Testimony of
　　　　　　　Plaintiff's Relatives Was Harmless

　　　　Plaintiff asserts that the ALJ failed to properly evaluate
the lay-witness testimony of her mother and aunt.  (J. Stip. at
17-18.)  For the reasons discussed below, any error was harmless.

　　　　　　1.  Applicable law

　　　　"In determining whether a claimant is disabled, an ALJ must
consider lay witness testimony concerning a claimant's ability to

work." <u>Bruce v. Astrue</u>, 557 F.3d 1113, 1115 (9th Cir. 2009) (citing <u>Stout v. Comm'r, Soc. Sec. Admin.</u>, 454 F.3d 1050, 1053 (9th Cir. 2006)). "Such testimony is competent evidence and '<u>cannot</u> be disregarded without comment.'" <u>Bruce</u>, 557 F.3d at 1115 (emphasis in original) (quoting <u>Nguyen v. Chater</u>, 100 F.3d 1462, 1467 (9th Cir. 1996)); <u>Robbins</u>, 466 F.3d at 885 ("[T]he ALJ is required to account for all lay witness testimony in the discussion of his or her findings."). When rejecting the statements of a lay witness, an ALJ must give specific reasons germane to that witness. <u>Diedrich v. Berryhill</u>, 874 F.3d 634, 640 (9th Cir. 2017); <u>Bruce</u>, 557 F.3d at 1115.

If an ALJ errs by providing reasons that are not germane, the error may be harmless. <u>See</u> <u>Valentine</u>, 574 F.3d at 694. Such an error is harmless if it is "'inconsequential to the ultimate nondisability determination' in the context of the record as a whole," <u>Molina</u>, 674 F.3d at 1122; <u>see also</u> <u>Tommasetti</u>, 533 F.3d at 1038, as when "the same evidence that the ALJ referred to in discrediting [the claimant's] claims also discredits [the lay witness's] claims," <u>Molina</u>, 674 F.3d at 1122 (alterations in original) (citing <u>Buckner v. Astrue</u>, 646 F.3d 549, 560 (8th Cir. 2011)).

2.   <u>The ALJ's decision</u>

The ALJ noted that Plaintiff's aunt

> testified that when she talks to [Plaintiff], she seems
> lost, very quiet, and forgetful [and] reports having
> frequent headaches and reports dizziness. She testified
> that she and [Plaintiff] go on walks together, and
> [Plaintiff] walks very slowly. [Plaintiff's aunt] . . .

24

is afraid to leave [Plaintiff] alone and takes her along
when [she] leaves the house. The witness stated that
during the day, [Plaintiff] is sad, depressed, and does
not want to do very much.

[Plaintiff's] mother . . . testified she is with her
daughter every day [and] helps her daughter to wash her
clothes and cook. She testified that [Plaintiff]
"always" has headaches[,] sometimes gets dizzy, and . .
. sometimes forgets things or does not understand and
repeats herself. She testified that sometimes a friend
comes to take [Plaintiff] out for a walk or to go to the
movies. She testified that [Plaintiff] sometimes cannot
lift her left leg and holds her left hand in a clenched
fist position. She testified that [Plaintiff] and family
members go to church together every Sunday, and they read
the Bible and books together.

(AR 442-43.) The ALJ reviewed this testimony and discounted it
for the same reasons he discounted Plaintiff's testimony: it was
"inconsistent with the medical record" (AR 443), her conservative
treatment (id.), and her daily activities (AR 444-45).

3. Analysis

The lay-witness testimony was largely consistent with
Plaintiff's, and the ALJ discounted it for the same reasons.
Plaintiff's aunt testified that Plaintiff "forg[ot] things," got
"[l]ots of headaches," walked slowly, got dizzy, had loss of
appetite, lay down "most of the time," had leg and hand pain, was
depressed, and had trouble using her left arm. (AR 502-04, 540-
46.) She testified that she helped Plaintiff with bathing and

25

making meals and went to the hospital with her.  (AR 541-42.)
Plaintiff's mother testified that she sometimes drove Plaintiff
to the hospital and doctor's appointments, washed her clothes,
and cooked for her.  (AR 513-14.)  She added that Plaintiff had
dizziness, headaches, and trouble lifting her left leg and hand;
forgot things; and sometimes repeated questions.  (AR 515, 517-
18.)

     The Ninth Circuit has held that lack of support from medical
evidence is not a germane reason for discounting lay
observations, at least in some cases.  See Diedrich, 874 F.3d at
640 (noting that lay observations "may offer a different
perspective than medical records alone," which "is precisely why
such evidence is valuable at a hearing").  But see Bayliss, 427
F.3d at 1218 (inconsistency with medical evidence can be germane
reason for rejecting testimony of "friends and family").  Thus,
as a matter of law, the ALJ may have erred by discounting the
lay-witness observations on this ground.  Any error was harmless,
however.

     As discussed, the ALJ provided clear and convincing reasons
for discounting Plaintiff's own testimony, thereby establishing a
sufficient basis for rejecting the similar statements of her
mother and aunt.  See Valentine, 574 F.3d at 694 (finding that
although ALJ improperly discounted claimant's wife's testimony in
part because she was "an interested party," any error was
harmless because ALJ gave clear and convincing reasons for
rejecting claimant's "similar" subjective complaints); Molina,
674 F.3d at 1122 (holding that ALJ's error in rejecting lay
witnesses' testimony was "harmless" because "ALJ had validly

                              26

rejected all the limitations described by the lay witnesses in discussing [claimant's] testimony").

Thus, because the ALJ provided sufficient reasons to discount Plaintiff's similar testimony, any error in discounting the lay-witness testimony was harmless and remand is not warranted on this ground.

**VI. CONCLUSION**

Consistent with the foregoing and under sentence four of 42 U.S.C. § 405(g), IT IS ORDERED that judgment be entered AFFIRMING the Commissioner's decision, DENYING Plaintiff's request for remand, and DISMISSING this action with prejudice.

DATED: ___July 6, 2021___    _____
                             JEAN ROSENBLUTH
                             U.S. Magistrate Judge

27